UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL** **'O'**

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-00925-CAS-JDEx | Date | September 28, 2026 |
| Title | Michael A. DiMatteo v. Hurdle Clay Jacke, II et al | | |

| | |
|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER |

| | | |
|---|---|---|
| Catherine Jeang | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| | |
|---|---|
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** (IN CHAMBERS) - DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT (Dkt. 53, filed July 31, 2026)

## I. INTRODUCTION

On June 10, 2024, plaintiff Michael DiMatteo ("Plaintiff" or "DiMatteo") filed his complaint in the Los Angeles County Superior Court. Dkt. 1-1 ("Compl."). The Complaint alleges four claims for relief against defendants the Honorable Hurdle Clay Jacke, II ("Jacke"), the Los Angeles County Sheriff's Department (the "Sheriff's Department" or "LASD"), Los Angeles County (the "County"), Sheriff's Deputy Adam Kennedy ("Deputy Kennedy"), and Does 1 through 10 for (1) violation of his First Amendment rights pursuant to 42 U.S.C. § 1983 ("§ 1983"); (2) violation of his Fifth and Fourteenth Amendment due process rights pursuant to § 1983; (3) violation of his Sixth Amendment rights pursuant to § 1983; and (4) violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132. Id. On February 3, 2025, defendants removed the case to this Court on the basis of federal question jurisdiction, 28 U.S.C. § 1331(a), pursuant to 28 U.S.C. §§ 1441(a) and (c) and 1443. Dkt. 1.

On February 18, 2025, the Sheriff's Department, the County, and Deputy Kennedy (collectively, the "County defendants" or the "defendants") filed a motion to dismiss. Dkt. 9. On March 24, 2025, the Court granted County defendants' motion to dismiss, with leave to amend. Dkt. 15.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL ‘O’**

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-00925-CAS-JDEx | Date | September 28, 2026 |
| Title | Michael A. DiMatteo v. Hurdle Clay Jacke, II et al | | |

On April 13, 2025, DiMatteo filed his First Amended Complaint. Dkt. 17 (“FAC”). On April 28, 2025, Jacke filed a motion to dismiss. Dkt. 18. On May 5, 2025, County defendants filed a motion to dismiss. Dkt. 19. On June 2, 2025, the Court granted Jacke’s motion to dismiss without leave to amend and granted County defendants’ motion to dismiss with leave to amend. Dkt. 26.

On June 20, 2025, DiMatteo filed his Second Amended Complaint against County defendants. Dkt. 27 (“SAC”). Therein he alleged three claims for relief: (1) First Amendment retaliation pursuant to § 1983; (2) violation of Government Code § 815.6, based on Penal Code § 13650; and (3) municipal liability under § 1983. SAC ¶¶ 17-31. On July 2, 2025, County defendants filed their motion to dismiss. Dkt. 28. On August 4, 2025, the Court granted County defendants’ motion to dismiss, with leave to amend his First Amendment retaliation claim and his municipal liability claim. Dkt. 32.

On September 4, 2025, DiMatteo filed his Third Amended Complaint against County defendants. Dkt. 33 (“TAC”). Therein he alleged three claims for relief: (1) First Amendment retaliation pursuant to § 1983 against Deputy Kennedy; (2) violation of Government Code § 815.6, based on Penal Code § 13650, against the County and the Sheriff’s Department; and (3) municipal liability under § 1983 against the County and the Sheriff’s Department. TAC ¶¶ 17-31.

On September 24, 2025, County defendants filed a motion to dismiss DiMatteo’s TAC. Dkt. 34. On November 3, 2025, the Court granted County defendants’ motion with respect to DiMatteo’s Government Code § 815.6 claim and denied the motion with respect to DiMatteo’s § 1983 claims.

On July 31, 2026, County defendants filed the instant motion for summary judgment. Dkt. 53 (“Mot.”). County defendants concurrently filed a statement of

uncontroverted facts, Dkt. 53-1, a request for judicial notice, Dkt. 53-2 ("RJN"), and an appendix of declarations and exhibits, Dkt. 53-3, 53-4, 53-5.[1] [2]

---

[1] Defendants request that the Court take judicial notice of Jacke's motion to dismiss DiMatteo's FAC, Dkt. 18, and the following exhibits attached thereto: (1) DiMatteo's Affidavit in Support of Order for Policies and Procedures of Los Angeles County Sheriff's Department, filed in People v. Max Verdi, No. BA474608 (Cal. Super. Ct.), dated July 19, 2023, Dkt. 18-2, Ex. E ("DiMatteo Affidavit"); (2) Order signed by Judge Cynthia Brogham for Policies and Procedures and Unit Orders concerning the Airport Courthouse and Twin Towers Correctional Facility, filed in People v. Neil Phillips, No. SA108370 (Cal. Super. Ct.), dated July 20, 2023, Dkt. 18-2, Ex. F ("Brogham Order"); (3) a March 14, 2024 letter from Jacke to DiMatteo, Dkt. 18-2, Ex. G ("Jacke Letter").; and (4) a June 12, 2024 letter from David Lee, Court Counsel, Los Angeles County Superior Court, to DiMatteo, Dkt. 18-2, Ex. H ("Lee Letter"). RJN at 1-2. Plaintiff does not appear to oppose the request. See Opp.

Pursuant to the Federal Rules of Evidence, the Court may take judicial notice of a fact "that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). "[U]nder Federal Rule of Evidence 201, a court may take judicial notice of matters of public record." Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001). Accordingly, the Court may take judicial notice of Jacke's motion to dismiss, Dkt. 18, and Judge Brogham's order in the Phillips case, Dkt. 18-2, Ex. F. See Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record."); U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) (stating that a court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (quoting St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1172 (10th Cir. 1979)); see also Fed. R. Civ. P. 56(c) (permitting consideration of materials in the record). However, the Court only judicially notices the existence of the documents; the Court does not accept the factual assertions therein.

"[A] court may take judicial notice of the filings on the docket in a case before that court." Ward v. Crow Vote LLC, 634 F. Supp. 3d 800, 807 (C.D. Cal. 2022), aff'd, No.

---

22-56108, 2024 WL 2239010 (9th Cir. May 17, 2024). Therefore, the Court may take judicial notice of the Jacke Letter, previously filed at Dkt. 18-2, Ex. G, and the Lee Letter, previously filed at Dkt. 18-2, Ex. H. However, because the letters discuss disputed issues of fact related to DiMatteo's suspension and removal from the PI Committee, the Court declines to take judicial notice of the Jacke Letter and the Lee Letter for the truth of the matter asserted therein. See Dkt. 39 at 6 n.2.

Finally, the Court declines to take judicial notice of the DiMatteo Affidavit because "the court need not rely on the document[] to decide the [m]otion." See Ward, 634 F. Supp. 3d at 807.

[2] At oral argument, defense counsel requested that the Court take judicial notice of the above documents for the truth of the matters asserted therein. To the extent that the documents discuss facts subject to reasonable dispute, the Court may not take judicial notice of those facts. See, e.g., Cal. Sportfishing Prot. All. v. Shiloh Grp., LLC, 268 F. Supp. 3d 1029, 1038 (N.D. Cal. 2017) ("Courts cannot take judicial notice of the contents of documents for the truth of the matters asserted therein when the facts are disputed."). Here, the rationale for DiMatteo's suspension and removal from the PI Panel, among other professional consequences, is disputed.

Even if the court did take judicial notice of the documents for the truth of the matters asserted therein, it would not change the Court's determination on this motion. As discussed below, the Court finds triable issues of fact as to Deputy Kennedy's conduct and intent as it relates to the K9 Alert and the Phillips investigation. Even if the Court were to consider the Lee Letter's stated rationale for DiMatteo's suspension and removal from the PI Panel, there would remain a dispute of material fact as to whether Deputy Kennedy's alleged retaliatory motive was a "substantial motivating factor" in his conduct. See Peterson v. City of Los Angeles, No. CV 2:21-05510, 2026 WL 851310, at *13 (C.D. Cal. Mar. 23, 2026) ("[T]here is a right to be free from retaliation even if a non-retaliatory justification exists for the defendants' action." (quoting O'Brien v. Welty, 818 F.3d 920, 936 (9th Cir. 2016))); cf. Capp v. Cnty. of San Diego, 940 F.3d 1046, 1056 (9th Cir. 2019) ("The mere existence of a legitimate motive . . . is insufficient to mandate dismissal. If Firth would not have made the recommendation absent retaliatory animus, there could still be a viable retaliation claim.").

On August 17, 2026, DiMatteo filed an opposition to County defendants' motion for summary judgment. Dkt. 55 ("Opp."). DiMatteo concurrently filed an appendix of exhibits, Dkt. 55-5, and a statement of genuine disputes of material fact, Dkt. 56.

On August 31, 2026, County defendants filed a reply. Dkt. 59 ("Reply"). County defendants concurrently filed a response and objections to plaintiff's statement of genuine disputes of material fact. Dkt. 60 ("Resp.").

Having carefully considered the parties' arguments and submissions, the Court finds and concludes as follows.

## II. BACKGROUND

The following facts are not meaningfully disputed and are set forth for purposes of background. Unless otherwise noted, the Court references only facts that are uncontroverted and to which evidentiary objections, if any, have been overruled.[3]

DiMatteo states that he previously served as a private investigator on the Los Angeles Superior Court Private Investigator Panel ("PI Panel"). Dkt. 55-4 ("DiMatteo Decl.") at 1-2. DiMatteo states that he regularly accepted court appointments to

---

Finally, to the extent that the defense requests that the Court take judicial notice of the documents to support its contention that Deputy Kennedy forwarded emails and took other action pursuant to his official job duties, the Court finds that there is no evidence to that effect contained within the documents submitted.

[3] County defendants assert numerous evidentiary objections to DiMatteo's evidence. See generally Resp. "In motions for summary judgment with numerous objections, it is often unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised." Capitol Records, LLC v. BlueBeat, Inc., 765 F. Supp. 2d 1198, 1200 (C.D. Cal. 2010). To the extent the Court relies on evidence to which there has been an objection, the Court has overruled the objection to that item of evidence. See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (explaining that, at summary judgment, courts may consider any evidence that could be presented in an admissible form at trial).

investigate cases and assist criminal defendants, including self-represented or "*pro per*" defendants housed in Los Angeles County Sheriff's Department facilities. Id. at 2.

Deputy Kennedy states that he is a Deputy Sheriff employed by the Los Angeles Sheriff's Department in the Jail Legal Unit at Men's Central Jail ("MCJ"). Dkt. 53-4 ("Kennedy Decl.") at 1.

On March 21, 2023, Deputy Kennedy called DiMatteo to pick up documents bound for a *pro per* inmate that DiMatteo had previously dropped off at MCJ. Resp. ¶ 3.

On March 22, 2023, Deputy Kennedy called DiMatteo. Id. ¶ 4. Deputy Kennedy told DiMatteo that a K9 dog had alerted on DiMatteo's documents (the "K9 Alert"). Id. Deputy Kennedy also told DiMatteo that DiMatteo was barred from the jail pending an investigation. Id.

Deputy Kennedy then prepared Incident Report SHR 23-00857-5100-184 for a suspected violation of Cal. Penal Code § 4573(a), "Bringing Controlled Substance into a Jail Facility." See id. ¶ 5.

Deputy Kennedy then telephoned Judge Hurdle Clay Jacke.[4] Id. ¶ 6. Deputy Kennedy told Judge Jacke that pending the lab confirmation, DiMatteo could no longer visit "*pro pers*" or any inmate at MCJ or any Los Angeles Sheriff's Department custody facility due to the suspected presence of narcotics on documents DiMatteo submitted to the jail to be given to an inmate. See id. Deputy Kennedy never emailed Judge Jacke to report the K9 alert on DiMatteo's documents bound for a *pro per* inmate at MCJ. See id. ¶ 7.

Deputy Kennedy contacted the crime laboratory concerning the processing of the submitted evidence. Id. ¶ 8. Deputy Kennedy states that he knew the lab can get "backed up." Id.; Kennedy Decl. ¶ 9.

On April 26, 2023, the crime lab issued the results of the document testing. Id. ¶ 9. The laboratory report results were negative, i.e., no identifiable controlled substances were identified in the tested item. Id.

[4] The Court granted Judge Jacke's motion to dismiss on the basis of judicial immunity. See id. ¶ 20.

Deputy Kennedy then called DiMatteo to advise him of the negative result . Id. ¶ 10. Deputy Kennedy also advised DiMatteo that he was allowed to come back into the jail. Id.

In July 2023, DiMatteo was appointed by the court as an investigator for an in-custody *pro per* defendant named Neil Phillips ("Phillips"). Id. ¶ 12. On July 19, 2023, DiMatteo submitted an affidavit in the case of People v. Max Verdi, No. BA474608 (Cal. Super. Ct.), seeking Sheriff's Department policies, procedures, and unit orders in connection with the Phillips matter. Id. ¶ 21. On July 20, 2023, DiMatteo obtained an order in the case of People v. Neil Phillips, No. SA108370 (Cal. Super. Ct.), for the Sheriff's Department to produce its policies and procedures and unit orders for the Airport Courthouse and Twin Towers facilities. Id. ¶ 22.

On March 14, 2024, the Superior Court Private Investigators Committee (the "PI Committee") investigated DiMatteo concerning the Phillips matter (the "Phillips Investigation"). Id. ¶¶ 14, 23; DiMatteo Decl. at 5. Specifically, the PI Committee investigated DiMatteo for his attempt to obtain information by court order. Id. ¶ 23. On June 12, 2024, DiMatteo was suspended and removed from the PI Panel based on the PI Committee's finding that DiMatteo used "artifice" to obtain documents by court order without Phillips's knowledge. See id. ¶ 24.

The Los Angeles Sheriff's Department has no formal role in appointing or removing investigators from the PI Panel. See id. ¶ 11. Deputy Kennedy was not a member of the PI Committee. Id. ¶ 13. Deputy Kennedy was not contacted by anyone, nor did he contact any judicial officer, during the Phillips investigation to discuss Plaintiff's temporary suspension from the jail in March 2023 for the K9 alert on documents he brought to the jail. Id. ¶ 18.

Deputy Kennedy had no involvement and did not participate in reviewing, compiling or sending documents on behalf of the Sheriff's Department to comply with any Public Records Act request ("PRA Requests") or subpoena from DiMatteo. Id. ¶ 19.

## III. LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying relevant portions of the

record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e). The nonmoving party must not simply rely on the pleadings and must do more than make “conclusory allegations [in] an affidavit.” Lujan v. Nat’l Wildlife Fed’n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324. Summary judgment must be granted for the moving party if the nonmoving party “fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial.” Celotex, 477 U.S. at 322.

In light of the evidence presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass’n, 809 F.2d 626, 631 n.3 (9th Cir. 1987). When deciding a motion for summary judgment, “the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.” Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Valley Nat’l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. See Matsushita, 475 U.S. at 587.

## IV. DISCUSSION

### A. First Amendment Claim

#### 1. First Amendment Retaliation Claim

Defendants argue that DiMatteo has no basis for his allegation that Deputy Kennedy penalized or otherwise injured DiMatteo as a result of DiMatteo’s complaints to about DiMatteo’s lack of access to LASD policies. See Mot. at 8. Defendants further argue that there is no basis to DiMatteo’s allegation that Deputy Kennedy communicated with judicial officers and other individuals in a manner that “ruined [DiMatteo’s]

reputation, interfered with his ability to obtain assignments and adversely affected his standing as a court appointed PI investigator." Id.

Defendants also argue that there is no nexus between Deputy Kennedy's response to the March 2023 K9 Alert and the subsequent Phillips investigation. Id. at 8-9. Defendants argue that Deputy Kennedy "did not conduct or aid in any investigation of [DiMatteo] in the Neil Phillips case." Id. at 9. Defendants argue that Deputy Kennedy "had no involvement with that investigation and had no communications to or from [the PI Committee]." Id. at 10. Defendants argue that Deputy Kennedy "never communicated, suggested, recommended or instructed any judicial officer in the suspension or removal of [DiMatteo]" from the PI Panel prior to DiMatteo's removal from the PI Panel in June 2024. Id. Defendants instead contend that DiMatteo was suspended and removed from the PI Panel because DiMatteo had "misuse[d] . . . his PI position (via artifice) to obtain documents by court order without his assigned [p]ro [p]er's knowledge." See id. at 11-12.

In opposition, DiMatteo contends that there are genuine factual disputes as to the nexus between Deputy Kennedy's conduct and DiMatteo's "multiple professional consequences." Opp. at 22-23. First, DiMatteo argues that there is a genuine dispute as to Deputy Kennedy's motive as it relates to the K9 Alert and surrounding events. Id. at 23. DiMatteo argues that he made a variety of oral and written "challenges," "complaints," and "objections" to LASD policies before and after the K9 Alert. Opp. at 15, 21. DiMatteo argues that before the March 2023 K9 Alert, he had "prior disagreements" with Deputy Kennedy related to PI-related policies. Id.; see also DiMatteo Decl. at 2. DiMatteo further argues that Deputy Kennedy's contemporaneous report of their March 21, 2023 dispute varies from DiMatteo's recorded recollection of the dispute. Id. at 30-31. Specifically, DiMatteo recorded the dispute as being about "new protocols," whereas Deputy Kennedy reported that the discussed policies were "common practice[s]." Id. DiMatteo contends that this discrepancy raises questions of credibility and motive that must be determined by a jury. Id.

DiMatteo argues that immediately after the March 21, 2023 dispute, Deputy Kennedy made a "professional threat" towards him. Specifically, DiMatteo argues that in his March 22, 2023 phone call with Deputy Kennedy about the K9 Alert, Deputy Kennedy did not simply tell DiMatteo that DiMatteo was unable to enter LASD facilities until the investigation was complete. Instead, DiMatteo contends that Deputy Kennedy

also asked for the private investigators' supervisor and told DiMatteo that he would ask the Superior Court to "consider removing [DiMatteo] from all *pro per* cases." Opp. at 23.

DiMatteo also argues that there is a genuine factual dispute as to the nexus between Deputy Kennedy's conduct, the Phillips investigation, and DiMatteo's eventual suspension and removal from the PI List. DiMatteo contends that there are email communications that connect the Phillips investigation, the PI Committee, and DiMatteo's "numerous allegations" against LASD entities. Id. at 24. DiMatteo argues that Deputy Kennedy received and forwarded an email chain containing these references. Id. DiMatteo also argues that in its June 12, 2024 suspension and removal letter, the PI Committee rejected its initial allegation that DiMatteo had presented himself as an attorney and instead relied on a finding that DiMatteo had used "artifice." Id. DiMatteo argues that this "change in rationale," together with the email communications, may lead a reasonable jury to find a causal link between Deputy Kennedy's conduct and DiMatteo's suspension and removal from the PI Panel. Id. DiMatteo argues that the fact that Deputy Kennedy lacked formal authority over DiMatteo's employment is not dispositive, as Deputy Kennedy may have "induce[d]" formal decisionmakers to take adverse action against DiMatteo. Id. at 25.

Finally, DiMatteo argues that there are factual discrepancies between Deputy Kennedy's incident report and contemporaneous surveillance footage as to the circumstances under which the K9 Alert took place. DiMatteo argues that these discrepancies raise a credibility issue that cannot be disposed of on summary judgment. Id. at 28-30.

In reply, defendants argue that DiMatteo "fail[ed] to establish causation." Reply at 2. Defendants reiterate their argument that DiMatteo "was removed from the panel due to his own conduct and no one else's." Id. Defendants also make several objections to DiMatteo's proffered evidence.[5] Id. at 3-9.

---

[5] First, defendants argue that DiMatteo sent defendants a "supplemental and amended statement of genuine disputes of material facts," which included previously unfiled facts related to (1) an August 23, 2026 interview of Joel Wyenn, a PI investigator and (2) a "preliminary review" by James Gibbons, a retired police sergeant and K9 handler whom DiMatteo concedes is not an expert. Reply at 3; see also Resp. at 1-2. Defendants argue

To state a First Amendment retaliation claim as a private citizen, a plaintiff must show that he: "(1) engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., there was a nexus between the defendant's actions and an intent to chill speech. Further, to prevail on such a claim, a plaintiff need only show that the defendant 'intended to interfere' with the plaintiff's First Amendment rights and that it suffered some injury as a result; the plaintiff is not required to demonstrate that its speech was actually suppressed or inhibited." Ariz. Students' Ass'n v. Ariz. Bd. of Regents, 824 F.3d 858, 867 (9th Cir. 2016) (citation modified) (citing Mendocino Envt'l Ctr. v. Mendocino Cnty., 192 F.3d 1283, 1300 (9th Cir. 1999)).[6]

---

that these proffers are untimely and made without good cause. Id. at 3-4. Defendants also argue that the newly proffered evidence is deficient and without basis because DiMatteo submitted no supporting declarations or exhibits. Id. Finally, defendants argue that these proffers give rise to a violation of Fed. R. Civ. P. 26(e). Id.

Second, defendants argue that DiMatteo's proffered transcripts of his own statements during his March 21, 2023 and March 22, 2023 phone calls with Deputy Kennedy are improper under 18 U.S.C. § 2511(2)(d), which sets forth the federal "one party consent" standard. Id. at 5-7. Defendants also argue that the transcripts violate the best evidence rule, Fed. R. Evid. 1002-1004; authentication requirements, Fed. R. Evid. 901; the rule of completeness; and the rule against hearsay, Fed. R. Evid. 801(d)(2).

The Court need not decide on the propriety of the disputed proffers at this stage. Even assuming *arguendo* that this proffered evidence is admissible, it has no effect on the Court's findings on this motion. See ViacomCBS Inc. v. Great Divide Ins. Co., 640 F. Supp. 3d 931, 938 (C.D. Cal. 2022) ("[W]here the challenged evidence is unnecessary to the resolution of the summary judgment motions or supports facts not in dispute, the Court need not resolve objections to that evidence here.").

[6] In its November 3, 2025 Order on defendants' motion to dismiss DiMatteo's TAC, the Court found that "plaintiff's First Amendment retaliation claim should be analyzed on the basis that plaintiff spoke as a private citizen." Dkt. 39 at 5. Consistent with that finding, both DiMatteo and defendants set forth the standard for First Amendment retaliation

---

against a private citizen in their briefings on the instant motion. Mot. at 13; Opp. at 20. The Court notes, however, that DiMatteo's opposition makes use of language that is typically associated with the standard applied to claims brought by public employees. See, e.g., Opp. at 8, 19 (referencing "adverse professional action" and "pretext"); see also Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009) (setting forth a five-part "public employee" inquiry for First Amendment retaliation claims). Moreover, DiMatteo states in a declaration that he sought LASD policies in relation to his "ability to perform court-appointed investigative work" and not for "an unrelated personal purpose." Dkt. 55-4 at 5 ("DiMatteo Decl.").

The Court reiterates that the private citizen inquiry is appropriate here. In Worrell v. Henry, 219 F.3d 1197 (10th Cir. 2000), the Tenth Circuit held that the Mendocino Envt'l Ctr. "private citizen" standard is proper "when allegations of retaliatory conduct are directed at a defendant who is not the plaintiff's employer and when there is no contractual relationship between them." 219 F.3d at 1212-13. In Worrell, a district attorney withdrew plaintiff's job offer based on law enforcement officials' complaints to the district attorney about the plaintiff's speech. Id. at 1200. Although the public employee analysis applied to plaintiff's First Amendment retaliation claim against the district attorney as plaintiff's would-be employer, the court applied the private citizen analysis to plaintiff's claims against the law enforcement officials. Id. at 1201. As the Tenth Circuit explained,

> public officials outside the employing agency and not parties to a contract with the plaintiff would raise the possibility of . . . a veto over personnel or contractual decisions. In particular, acting with retaliatory intent, a third party upon whose cooperation the employer depended could refuse to cooperate with the employer unless a particular employee were fired, demoted, or transferred. By withholding cooperation, the third party could effectively create the very workplace disruption that, under the [public employee] approach, could be used to justify the limitation of First Amendment rights.

F.3d 1197 at 1210-11.

*a. Protected Speech*

The parties do not appear to dispute that DiMatteo's speech is protected under the First Amendment. DiMatteo asserts his First Amendment retaliation claim on the basis of his complaints, public records requests, and other communications related to LASD policies and procedures. See Dkt. 53-3, Ex. A at 17 ("DiMatteo Interrog."); DiMatteo Decl. at 2-5; Dkt. 55-5, Ex. 4 ("April 2, 2023 LASD Public Complaint"); TAC ¶¶ 11-15. The Ninth Circuit has held that public records requests and citizen complaints are

---

The Court finds the Tenth Circuit's reasoning instructive. There is nothing in the record to suggest that Deputy Kennedy is DiMatteo's employer, and both parties agree that Deputy Kennedy was not a member of the PI Committee that suspended and removed DiMatteo from the PI Panel. See Resp. ¶ 13; Leverington v. City of Colorado Springs, 643 F.3d 719, 731 (10th Cir. 2011) (holding that the public employee analysis did not apply where the defendant "does not claim to have had any authority to make any employment decisions on behalf of" the plaintiff's employer). Moreover, there is no indication that the relationship between DiMatteo and Deputy Kennedy "implicates governmental interests similar to those involved in the employment context." See Clairmont v. Wilson, No. C08-507Z, 2009 WL 2713918, at *4 (W.D. Wash. Aug. 27, 2009) (applying the Eng five-part analysis where a contracted provider of domestic violence perpetrator treatment brought suit against domestic violence probation unit employees because "the Probation Unit has a substantial interest in ensuring that [treatment] providers are competent, compliant with . . . regulations, and responsive to the Probation Unit's needs"); Kinney v. Weaver, 367 F.3d 337, 360 (5th Cir. 2004) (applying the public employee standard to a claim brought by police academy instructors against police officials because "[l]aw enforcement agencies have a legitimate interest in exercising discretion over the choice of the instructors who train the officers").

Instead, DiMatteo's relationship with Deputy Kennedy and the LASD appears to resemble the relationship between the Worrell plaintiff and law enforcement defendants, who were expected to "work closely" together but did not have an employment or contractual relationship. See Worrell, 219 F.3d at 1210; see also Ostly v. City & Cnty. of San Francisco, No. 21-CV-08955-EMC, 2023 WL 4053800, at *4 (N.D. Cal. June 15, 2023), aff'd, No. 23-16000, 2024 WL 3963839 (9th Cir. Aug. 28, 2024) (finding that there was no actionable "retaliatory employer conduct" alleged in an assistant district attorney's First Amendment claims against the public defender's office).

protected speech. See O'Brien v. Welty, 818 F.3d 920, 933 (9th Cir. 2016) (holding that the plaintiff's public records requests and online complaints qualified as constitutionally protected activity under the First Amendment); CarePartners, LLC v. Lashway, 545 F.3d 867, 876–77 (9th Cir. 2008) (holding that plaintiff's "advocacy regarding interpretation" of policy were "protected by his right to free speech"); Sampson v. Cnty. of Los Angeles, 974 F.3d 1012, 1019 (9th Cir. 2020) (holding that plaintiff's complaints about defendant and its employees was protected speech); Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989) ("There is no dispute that [plaintiff] has a protected interest in commenting on the actions of government officials.").

*b. "Chill a Person of Ordinary Firmness"*

As to the second prong of the First Amendment retaliation inquiry, the Court finds that there is a genuine dispute of material fact as to whether Deputy Kennedy's conduct would "chill a person of ordinary firmness." See Ariz. Students' Ass'n, 824 F.3d at 867. Courts do not ask whether defendants' actions *actually* chilled plaintiff's speech, but rather whether the alleged retaliation "would chill *a person of ordinary firmness* from continuing to engage in the protected activity." Capp v. Cnty. of San Diego, 940 F.3d 1046, 1054 (9th Cir. 2019) (quoting O'Brien, 818 F.3d at 932).

As a threshold matter, there is a genuine dispute of material fact as to the nature of Deputy Kennedy's conduct related to the K9 Alert. First, the parties dispute the purpose and nature of Deputy Kennedy's phone call to Judge Jacke following the K9 Alert. Deputy Kennedy states that he called Judge Jacke "for the *sole purpose* of informing him that pending the lab confirmation, [plaintiff] could no longer visit any pro pers, or any inmate" at an LASD facility. Dkt. 53-4 ("Kennedy Decl.") ¶ 7 (emphasis added). Deputy Kennedy further states that he "never communicated, suggested, recommended or instructed any judicial officer in the suspension or removal of Plaintiff from the Private Investigator panel prior to Plaintiffs removal from the panel in June 2024." Id. ¶ 17. In contrast, DiMatteo states that in his own phone call with Deputy Kennedy—which took place before Deputy Kennedy's call with Judge Jacke—Deputy Kennedy "demanded that [DiMatteo] identify the judge responsible for supervising private investigators and told me, in substance, that he intended to contact the [c]ourt concerning my suitability to continue working with pro per defendants." DiMatteo Decl. at 3. "Where, as here, the declarations contradict each other" with regard to the nature of the defendant's relevant conduct, "summary judgment is precluded." See Finch v. Lopez, No. ED CV 10-1440, 2013 WL 2898055, at *2 (C.D. Cal. June 11, 2013).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL** ‘O’

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-00925-CAS-JDEx | Date | September 28, 2026 |
| Title | Michael A. DiMatteo v. Hurdle Clay Jacke, II et al | | |

DiMatteo proffers additional supporting evidence in the form of Judge Jacke’s June 29, 2023 letter to DiMatteo. Dkt. 55-5, Ex. 9.[7] In the letter, Judge Jacke informed DiMatteo that the Superior Court had been notified on March 27, 2023, of DiMatteo’s temporary suspension from visiting LASD facilities pending an investigation. Id. The letter also states that, in addition to this notification, “it was suggested that [DiMatteo] not be appointed on any new cases.” Id. Drawing inferences in favor of DiMatteo as the non-moving party, the Court concludes that a rational trier of fact could find that Deputy Kennedy recommended that Jacke stop assigning DiMatteo’s appointments following the K9 Alert. Because the nature of Deputy Kennedy’s statements to DiMatteo and Jacke are material to the question of whether Deputy Kennedy’s conduct would “chill a person of ordinary firmness,” and because a rational trier of fact could find in favor of DiMatteo, summary judgment is not proper.

Although it is a closer question, the Court also finds there is a dispute of material fact as to DiMatteo’s conduct related to the Phillips investigation. Defendants assert that Deputy Kennedy “had no involvement” with the Phillips investigation and made “no communications” to the PI Committee or in furtherance of the investigation. Resp. ¶¶ 14-15. In opposition, DiMatteo proffers two sets of emails between individuals who appear to be LASD employees, including Deputy Kennedy, and a “Judge Hayden Zacky” (“Zacky”). Dkt. 55-5, Ex. 11.[8] The first set of emails includes a July 23, 2023 email (the

[7] Although the Court has not taken judicial notice of the truth of the contents asserted in the letter, the Court need not decide the admissibility of the contents of the letter at the summary judgment stage. “It would be sufficient if the contents of the [letter] were admissible at trial.” Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003). “At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents.” Id. The contents of the letter, as discussed here, may be admissible in the form of Jacke’s direct testimony. See id. at 1037.

[8] Defendants object to this evidence and Dkt. 55-5, Ex. 12, as irrelevant and misplaced pursuant to Fed. R. Evid. 401. The Court overrules these objections. As discussed, the Court finds that this evidence tends to make Deputy Kennedy’s involvement with the Phillips investigation more probable than it would without the evidence. Moreover, the nature of Deputy Kennedy’s involvement is a fact of consequence in determining the merits of DiMatteo’s First Amendment retaliation claim.

“Zacky email”) from a “Judge Hayden Zacky” (“Zacky”) to a “Jose R. Velasquez” (“Velasquez”). In this email, Zacky writes that he “spoke with Judge Brougham [sic] who signed the order,” who “told me to tell you to disregard the order.” Id. The Zacky email further states that “this guy is playing loose” and states that Zacky “will discuss him with the investigator committee chair.” Id. On July 25, 2023, Velasquez forwarded the Zacky email to four other LASD-affiliated individuals. See id. (the “first Velasquez email”). Velasquez also wrote:

> This is being taken to the PI Committee now and the Judge will let me know the outcome soon. This is against PI DiMatteo whom has made a lot of allegations against MCJ Legal / TTCF Visiting an [sic] now TTCF Legal. Our Chief Judge Zacky is assisting on this by clearing up all miss [sic] information/allegations.

Id. On July 25, 2023, Velasquez forwarded both the Zacky email and the first Velasquez email to Deputy Kennedy. Id. (the “second Velasquez email”). Velasquez wrote: “This is from Judge Zacky Sir……….FYI.” Id. On July 25, 2023 and July 26, 2023, Deputy Kennedy forwarded the second Velasquez email to an “Adam P. Kennedy,” “Donald S. Hinton,” and “Michael P. Larson.” Id.

DiMatteo also presents a second email chain with the subject “UPDATE ON THE DIMATTEO ISSUE: 08/10/2023.” Dkt. 55-5, Ex. 12. On August 10, 2023, Velasquez emailed Zacky, asking, “On the DiMatteo issue do I send a grievance to a court?” Id. The same day, Zacky replied: “Obviously, I can't tell you what to do; however, we are looking into it on our end. I will keep you posted on any developments.” Id. Velasquez then forwarded this email chain to Deputy Kennedy and two other individuals, explaining that he “decided to ask the Judge if and what he would recommend at this point.” Id. Deputy Kennedy responded to Velasquez, saying, “Thank you for the update.” Id.

The above evidence is not clear as to Zacky’s precise role relative to the Superior Court PI Committee. However, Zacky wrote that he would raise concerns about DiMatteo to the “investigation committee chair.” Dkt. 55-5, Ex. 11. In the same email that referenced a Judge Brogham order, Zacky also stated that “we are looking into” DiMatteo “on our end.” Id. In connection with those statements, Velasquez wrote that “Chief Judge Zacky is assisting on this by clearing up” DiMatteo’s prior “allegations” against LASD officials. Id. Therefore, the Court concludes that a rational trier of fact

could find that Zacky occupied a role of influence in relation to the Phillips investigation. A rational trier of fact could also conclude from this evidence that Zacky raised concerns about DiMatteo's prior "allegations" to the PI Committee in relation to the Phillips investigation.

The Court concludes that a rational trier of fact could further find that Deputy Kennedy's conduct in relation to Zacky and the Phillips investigation would "chill a person of ordinary firmness." Elsewhere, DiMatteo proffers evidence to suggest that DiMatteo had previously made complaints against both Deputy Kennedy and Velasquez in relation to disputes over LASD policies and procedures. See Dkt. 55-5, Ex. 4 (setting forth an April 2, 2023 LASD public complaint against Deputy Kennedy in connection with the K9 Alert); id. Ex. 8 (noting in a June 7, 2023 memo to LASD officials that "Deputy Velasquez" had provided him with contradictory information about LASD policy). A rational trier of fact could find that Velasquez discussed these or related complaints with Judge Zacky, who in turn said he was "looking into" the issue "on our end" simultaneous to the events giving rise to the Phillips investigation. Velasquez then forwarded these emails to Deputy Kennedy, who in turn forwarded some of the emails to three other individuals. Moreover, a rational trier of fact could infer from the second set of proffered emails that Velasquez and Kennedy had discussed the possibility of filing a grievance in connection with the Phillips investigation, and that Velasquez had in turn discussed this with Zacky.

Accordingly, the Court concludes that there is a material issue of disputed fact as to Deputy Kennedy's involvement in the Phillips investigation. A rational trier of fact could find from this evidence that Deputy Kennedy was involved in Velasquez's apparent efforts to advocate against DiMatteo's interests on the basis of DiMatteo's prior complaints. It follows that there is also a triable issue of fact as to whether such conduct would "chill a person of ordinary firmness."[9] See Worrell, 219 F.3d at 1213 (vacating summary judgment where there was evidence that a non-employer's comments to an employer caused "the loss of a job" and had "adverse impact on [plaintiff's] career progress").

[9] The Court observes that this question of fact may be better decided on a Rule 50 motion following trial, when the Court has heard all of the evidence.

*c. Substantial Motivating Factor*

Finally, the Court finds that there is a genuine dispute of material fact as to Deputy Kennedy's retaliatory intent. In First Amendment cases, "[a] plaintiff may establish motive using direct or circumstantial evidence." Ariz. Students' Ass'n, 824 F.3d at 870. "In cases involving First Amendment retaliation in the employment context, we have held that a plaintiff may rely on evidence of temporal proximity between the protected activity and alleged retaliatory conduct to demonstrate that the defendant's purported reasons for its conduct are pretextual or false." Id.

As an initial matter, there is a genuine dispute of material fact as to Deputy Kennedy's awareness of and involvement with DiMatteo's protected speech related to LASD policies and procedures. "In order to retaliate against [a plaintiff] for his speech, [a defendant] must be aware of that speech." See Allen v. Iranon, 283 F.3d 1070, 1076 (9th Cir. 2002). Defendants assert, and DiMatteo does not dispute, that "Deputy Kennedy had no involvement and did not participate in reviewing, compiling or sending documents on behalf of the Sheriff's Department to comply with any Public Records Act request or subpoena from Plaintiff." Resp. ¶ 19. However, DiMatteo proffers an email exchange between Deputy Kennedy and another individual, which has the subject line "DiMatteo" and discusses a PRA request for LASD communications with DiMatteo. See Dkt. 55-5, Ex. 7. A rational finder of fact could conclude from this evidence that Deputy Kennedy was involved in responding to at least one of DiMatteo's PRA requests. Furthermore, Deputy Kennedy states that his involvement with DiMatteo is "limited, and originated with the March 21, 2023 telephone call to Plaintiff to pick up documents" from MCJ. Kennedy Decl. ¶ 4. However, DiMatteo states that prior to March 2023, DiMatteo had a "dispute" with Deputy Kennedy in which Deputy Kennedy "accused [him] of violating a rule" governing communications with pro per defendants. DiMatteo Decl. at 2. A rational finder of fact could conclude from this evidence that Deputy Kennedy was involved in multiple exchanges with DiMatteo about LASD policies and procedures in the relevant time period.

Furthermore, a rational trier of fact could conclude that Deputy Kennedy was motivated by retaliatory intent in relation to the K9 Alert. The Court observes that, as a general matter, "[q]uestions involving a person's state of mind . . . are generally factual issues inappropriate for resolution by summary judgment." Braxton-Secret v. A.H. Robins Co., 769 F.2d 528, 531 (9th Cir. 1985); see also CarePartners, 545 F.3d at 879 (affirming the district court's denial of summary judgment on a First Amendment

retaliation claim where "issues of fact remained with regard to the [defendants'] motivations"). Here, the parties do not dispute that Deputy Kennedy called DiMatteo on March 21, 2023 to instruct DiMatteo to pick up documents that DiMatteo had previously dropped off to MCJ for a *pro per* defendant (the "documents") and to replace them with photocopies. See Resp. ¶ 3; Kennedy Decl. ¶ 4. The parties also do not dispute that on March 22, 2023, Deputy Kennedy called DiMatteo to inform DiMatteo that a K9 dog had alerted on the documents. See Resp. ¶ 4. The parties do not dispute that the results of the subsequent laboratory testing of the documents were "negative." See id. ¶ 9. Construing this evidence in the light most favorable to DiMatteo, the Court finds a triable issue of fact as to Deputy Kennedy's motive and intent. As plaintiff points out, "the K9 drug dog had come into the facility and the Sheriff's Department had checked [the documents] . . . even though Deputy Kennedy had informed [DiMatteo] that he wished [DiMatteo] to remove, copy, and replace [the documents]." Dkt. 55-5, Ex. 7 at 10. Accordingly, a rational finder of fact could conclude from this circumstantial evidence that Deputy Kennedy's conduct related to the K9 Alert was motivated by retaliatory intent. See Ariz. Students' Ass'n, 824 F.3d at 870; see also Mendocino Env'tl Ctr., 192 F.3d at 1303 ("The possibility that other inferences could be drawn that would provide an alternate explanation for the appellants' actions does not entitle them to summary judgment.").

Finally, the Ninth Circuit has "held that proximity in time may support an inference of retaliation sufficient to survive summary judgment." Anthoine v. N. Cent. Ctys. Consortium, 605 F.3d 740, 751 (9th Cir. 2010). Here, it is undisputed that the K9 Alert and Deputy Kennedy's subsequent call to Judge Jacke occurred within a matter of days after DiMatteo's March 21, 2023 exchange with Deputy Kennedy about MCJ procedures. See Resp. ¶¶ 3-5. Moreover, the July and August 2023 emails between Deputy Kennedy, Velasquez, Zacky, and others occurred within eight months of the PI Committee's March 14, 2024 letter informing DiMatteo that he was under investigation. See Ex. 55-5, Exs. 11, 12, 13. The Ninth Circuit has held that similar gaps in time permit a plaintiff's First Amendment retaliation claim to survive summary judgment. See CarePartners, 545 F.3d at 878 (affirming the district court's denial of summary judgment where the defendants' allegedly unconstitutional conduct occurred "suspiciously close in time" to plaintiff's speech several months earlier); Anthoine, 605 F.3d at 740 (finding that a gap of "days" between the employee's protected speech and employer's discipline was sufficient); Coszalter v. City of Salem, 320 F.3d 968, 977 (9th Cir. 2003) ("Depending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation.").

*d. Section 1983 Causation*

DiMatteo asserts his First Amendment retaliation claim pursuant to 42 U.S.C. § 1983. Under § 1983, defendants may be held liable not only for "direct personal participation" in a deprivation of plaintiff's constitutional rights, but also for "setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." Lacey v. Maricopa Cnty., 693 F.3d 896, 915 (9th Cir. 2012) (quoting Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978)).

The parties dispute whether Deputy Kennedy's conduct has a sufficient causal relationship with DiMatteo's suspension and removal from the PI Committee, among other alleged consequences. See, e.g., Resp. ¶ 15. As discussed above, a rational juror may find that DiMatteo's proffered evidence gives rise to an attenuated chain of causation between DiMatteo's conduct and the PI Committee's decision to remove and suspend DiMatteo. In any case, such a determination is best left to the trier of fact. See Tahoe Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 34 F.3d 753, 756 (9th Cir.), amended, 42 F.3d 1306 (9th Cir. 1994) ("[A] question of causation is preeminently a question of fact, to be decided after trial."); cf. Terpin v. AT&T Mobility, LLC, No. 2:18-CV-06975-ODW (KSX), 2025 WL 1952101, at *4 (C.D. Cal. July 16, 2025) ("Proximate cause is generally a question of fact for the jury. However, where the facts are undisputed and only one inference may reasonably be drawn from them, it becomes a question of law for the court." (citing Steinle v. United States, 17 F.4th 819, 822 (9th Cir. 2021))).

2. Qualified Immunity

Defendants argue that Deputy Kennedy is entitled to qualified immunity because there is no nexus between Deputy Kennedy's conduct and the repercussions DiMatteo faced, and therefore there is no underlying constitutional violation. Mot. at 16. Moreover, defendants contend that "no reasonable deputy in Deputy Kennedy's shoes could reasonably believe they were violating [p]laintiff's rights if they engaged in the same conduct in follow up to the K9 alert." Id. at 18. Defendants cite Huskey v. City of San Jose, 204 F.3d 893 (9th Cir. 2000), for the proposition that there is no clear First Amendment violation where a plaintiff "fail[s] to produce evidence demonstrating a nexus" between the plaintiff's speech and their subsequent employment repercussions. Id. at 18-19. Defendants reiterate their argument that DiMatteo makes no showing of a "nexus" here. Id.

In opposition, DiMatteo argues that the pertinent question is whether it was clearly established at the time of the K9 Alert that "public officials may not retaliate against a person for protected speech, that government benefits may not be withheld from an independent contractor in retaliation for protected expression, and that an official cannot avoid Section 1983 causation merely because a separate actor carries out the final adverse action." Opp. at 32. DiMatteo argues that the answer to this question is yes. Id. (citing Bd. of Cnty. Commissioners v. Umbehr, 518 U.S. 668 (1996); Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 923 (9th Cir. 2004); Lacey, 693 F.3d 896).

To determine whether a government official is entitled to qualified immunity, courts generally determine (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Mullenix v. Luna, 577 U.S. 7, 11 (2015) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). "Defendants are entitled to qualified immunity, even if they violated [plaintiff's] First Amendment rights, if they reasonably could have believed that their conduct was lawful 'in light of clearly established law and the information that they possessed.'" Demers v. Austin, 746 F.3d 402, 417 (9th Cir. 2014) (citation modified) (quoting Cohen v. San Bernardino Valley Coll., 92 F.3d 968, 973 (9th Cir. 1996)).

A "case directly on point" is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). The determination of whether the law was clearly established "must be undertaken in light of the specific context of the case." Saucier v. Katz, 533 U.S. 194, 201 (2001). In other words, the law must provide officials with "fair warning" that their conduct is unconstitutional. Hope v. Pelzer, 536 U.S. 730 (2002).

As discussed above, a rational juror may find in favor of DiMatteo on his First Amendment retaliation claim. In this sense, Huskey is inapposite. 204 F.3d at 899-900 (granting summary judgment to defendants "[b]ecause Huskey failed to introduce any evidence that his protected speech was a substantial motivating factor in any adverse employment action he allegedly experienced"). Therefore, defendants' argument on the first qualified immunity prong fails at this stage. See Pearson, 555 U.S. at 232.

As to the second prong, the Court finds that “[t]he constitutional right to be free from retaliation was clearly established at the time of defendants' actions.” O'Brien v. Welty, 818 F.3d 920, 936 (9th Cir. 2016). “Retaliation for engaging in protected speech has long been prohibited by the First Amendment.” Id. The Ninth Circuit has “made it clear that there is a right to be free from retaliation even if a non-retaliatory justification exists for the defendants' action.” Id.

At the time of the K9 Alert, it was clearly established that officials violate the First Amendment when they take retaliatory action on the basis of a private citizen’s protected speech, including complaints about officials’ conduct and policies, see CarePartners, 545 F.3d at 876-77, and public records requests, see O'Brien, 818 F.3d at 933, 935.[10] It was also clearly established that a defendant may be culpable if he “sets in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.” See Lacey, 693 F.3d at 915-196 (quoting Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978)) (finding that plaintiffs adequately stated a First Amendment retaliation claim where a defendant “pressured county attorneys” to

---

[10] At least one district court in the Ninth Circuit has concluded that there is no First Amendment right to request public records. See Brennan v. Aston, No. 17-CV-1928-JCC-MLP, 2019 WL 5225047, at *6 (W.D. Wash. Aug. 16, 2019), report and recommendation adopted, No. C17-1928-JCC, 2019 WL 5212768 (W.D. Wash. Oct. 16, 2019). However, that decision did not acknowledge the Ninth Circuit’s holding in O’Brien. Moreover, DiMatteo’s speech in the instant case more closely resembles the protected speech in O’Brien than it does the unprotected speech in Aston. Compare O’Brien, 818 F.3d at 933 (holding that plaintiff both expressed his opposition on a website *and* filed public records requests), with Aston, 2019 WL 5225047, at *6 (involving a plaintiff who merely filed a public disclosure request without additional expressive speech); see also Giddens v. Solano Cnty., No. 219CV0019, 2020 WL 814155, at *2 (E.D. Cal. Feb. 19, 2020), report and recommendation adopted, No. 219CV0019, 2020 WL 1166717 (E.D. Cal. Mar. 11, 2020) (suggesting that O’Brien stands for the proposition that “submitting a public records request, without making other protected speech, is not protected under the First Amendment”). Accordingly, the Court finds that O’Brien, among other cases, clearly established that any acts of retaliation against DiMatteo on the basis of his alleged speech would be in violation of the First Amendment.

prosecute plaintiffs, "was complicit" in an investigation of the plaintiffs, and "ordered" plaintiffs' arrest); see also Worrell, 219 F.3d at 1213 (vacating a grant of summary judgment where there was evidence that a non-employer defendant had "caused the withdrawal of [plaintiff's] job offer" by providing information to plaintiff's would-be employer). Accordingly, the Court concludes that summary judgment is not warranted on the basis of qualified immunity.[11]

---

[11] At oral argument, defense counsel directed the Court's attention to Zorn v. Linton, 607 U.S. 568 (2026) (per curiam). Defense counsel suggested that the case supported the proposition that Deputy Kennedy was entitled to qualified immunity because, like the defendant in Zorn, Deputy Kennedy's alleged unconstitutional conduct was performed pursuant to his job duties. Specifically, counsel represented that Deputy Kennedy sent and forwarded emails relevant to this case because he was required to do so pursuant to his job duties as the custodian of records at MCJ.

The Court is not persuaded that Zorn lends any support to the defendants' argument. In Zorn, the Supreme Court reversed the Second Circuit's denial of qualified immunity to a police officer who had used a wrist restraint after warning a passive protestor that the officer would use force to remove her if she did not comply. Zorn, 607 U.S. at 573-74. The Court held that the case law on which the Second Circuit relied, Amnesty America v. West Hartford, 361 F.3d 113 (2d Cir. 2004), did not clearly establish that the Zorn defendant's conduct violated the Fourth Amendment. Instead, the Court observed that the court in Amnesty America had remanded for a jury trial because a reasonable fact finder could find that the use of force was reasonable under the circumstances in that case. Id. at 573. Even if the Second Circuit was correct that Amnesty America established that the "gratuitous" use of a rear-wristlock was a violation of the Fourth Amendment, the Court held that the case did not "obviously resolve whether using a rear wristlock to move a noncompliant protester after repeated warnings violates the Fourth Amendment." Id. at 574 (citation modified).

Contrary to defense counsel's suggestion, Zorn does not appear to discuss the defendant's job duties relative to his alleged constitutional violation. Even if it did, the defense has offered no evidence as to Deputy Kennedy's job duties, let alone whether his conduct was consistent with those duties. Moreover, the fact that the Zorn defendant's conduct did not amount to a clearly established Fourth Amendment violation has no bearing on

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL** **'O'**

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-00925-CAS-JDEx | Date | September 28, 2026 |
| Title | Michael A. DiMatteo v. Hurdle Clay Jacke, II et al | | |

**B. Municipal Liability**

Defendants argue that DiMatteo's municipal liability claim fails because "there is no underlying constitutional violation of retaliation for exercise of speech." Mot. at 14.

In opposition, DiMatteo argues that there are triable issues of fact as to his First Amendment retaliation claim. Opp. at 33. DiMatteo also argues that there are triable issues of fact as to whether a "qualifying policy, custom, deliberate failure to train or supervise, or ratification by a final [c]ounty decisionmaker" existed. Id. at 33-34. According to DiMatteo, a jury could find in his favor because "[m]ultiple LASD Legal Units, supervisors, Internal Affairs personnel, and custody facilities received or handled Plaintiff's complaints and policy requests; LASD personnel communicated with judicial officers regarding Plaintiff and his access; and the July and August chains reflect institutional coordination regarding the continuing '*DiMatteo issue*.'" Id.

Pursuant to Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978), a government entity may be held liable under 42 U.S.C. § 1983 if a "policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." Dougherty v. City of Covina, 654 F.3d 892, 900 (9th Cir. 2011) (citing Monell, 436 U.S. at 694). A policy or custom may be shown through: (1) a longstanding practice or custom which constitutes the "standard operating procedure" of the municipality; (2) a decision or action by a municipal official who has final policymaking authority; or (3) the ratification of a subordinate's decision or action by an

---

the instant First Amendment retaliation claim. Indeed, the Ninth Circuit has recently affirmed denials of qualified immunity in similar cases. Cf. Ryan v. Putnam, No. 22-55144, 2023 WL 4145436, at *1 (9th Cir. June 23, 2023) (holding that "setting in motion" an investigation that threatened to revoke employment privileges was a violation of clearly established law); Kando v. City of Long Beach, No. 21-56199, 2023 WL 3092304, at *1 (9th Cir. Apr. 26, 2023) (denying qualified immunity to an official who threatened to sue a private citizen who criticized and sought to file a complaint about the official's conduct); Grigorescu v. Whitlock, No. 24-547, 2025 WL 900431, at *1 (9th Cir. Mar. 25, 2025) (holding that it was clearly established that a retaliatory investigation based on a public employee's protected expression amounted to a constitutional violation).

official with final policymaking authority. Avalos v. Baca, 596 F.3d 583, 588 (9th Cir. 2010).

Contrary to defendants’ contention, and as discussed above, the Court finds there is a genuine dispute of material fact as to DiMatteo’s alleged constitutional injury. Therefore, the Court may not grant summary judgment on the basis of plaintiff’s failure to show an issue of triable fact on his underlying constitutional claim.

However, DiMatteo’s evidence fails to raise any dispute of material fact as to a County or LASD policy, practice, or custom that served as a “moving force” behind the violation of his constitutional rights. DiMatteo contends that there is an issue of triable fact as to whether there is a relevant (1) policy, (2) custom, (3) ratification by a final County decisionmaker, (3) deliberate failure to train, or (5) failure to supervise. As discussed here, his Monell claim fails under all five theories.

Plaintiff proffers June and August 2023 email exchanges between Deputy Kennedy, other LASD affiliates, and a judge. See Dkt. 55-5, Exs. 11, 12. The Court finds that a rational trier of fact could not infer from the evidence that this sequence of events amounted to a “policy, practice, or custom.” First, DiMatteo’s evidence identifies no formal policy. Second, DiMatteo’s evidence does not give rise to a triable issue of fact as to a longstanding practice or custom. To establish such a practice or custom, a plaintiff must show that the municipal practice is “so pervasive as to have the force of law.” Thompson v. City of Los Angeles, 885 F.2d 1439, 1443-44 (9th Cir. 1989). “[T]he alleged singling out” of a plaintiff “is insufficient to establish ‘custom or practice’ Monell liability.” See Janiec v. City of Glendora, 842 F. App'x 129, 131 (9th Cir. 2021); Christie v. Iopa, 176 F.3d 1231, 1235 (9th Cir. 1999) (“Plaintiffs cannot satisfy the requirement of a longstanding practice or custom, because they allege to the contrary that a county official has singled them out for unique treatment.”). At most, DiMatteo’s evidence suggests that LASD officials sought to influence the PI Committee and the Phillips investigation against DiMatteo’s interests. However, DiMatteo proffers no admissible evidence to suggest that any other individual has been subject to similar treatment.[12] In other words, DiMatteo’s evidence suggests only that he was “singled

[12] DiMatteo’s supplemental and amended statement of genuine disputes of material fact alleges that Deputy Kennedy advised another PI, Joel Wyenn, that Deputy Kennedy would notify judges that Wyenn would be relieved of LASD-related cases while he was

out.” See id. Accordingly, DiMatteo fails to establish an issue of triable fact as to the existence of a longstanding practice or custom.

To the extent that DiMatteo’s Monell claim is premised on an official policymaker’s conduct or ratification of a subordinate’s conduct, DiMatteo has “failed to even identify a final policymaker” who allegedly acted or ratified a subordinate’s actions, and therefore DiMatteo’s claim “cannot survive summary judgment on this ground.” See Williams v. City of Los Angeles, No. 220CV06961, 2023 WL 3317064, at *16 (C.D. Cal. Mar. 7, 2023).

Finally, DiMatteo fails to present any dispute of material fact in relation to his failure-to-train or failure-to-supervise theories of municipal liability. See TAC ¶ 32. A municipality’s failure to train may serve as the basis for Monell liability if the inadequate training amounts to deliberate indifference. See Dougherty, 654 F.3d at 900. Deliberate indifference exists if the need to train was obvious and the failure to do so made a violation of constitutional rights likely. Id. (citing City of Canton v. Harris, 489 U.S. 378, 390 (1989)). Similarly, a failure to supervise that is “sufficiently inadequate” may

---

suspended from all LASD facilities pending laboratory testing. See Resp. at 34-35. Even if the Court took this alleged statement under consideration, it would not change the Court’s determination. DiMatteo does not allege that Deputy Kennedy’s statements to Wyenn were in any way unconstitutional. Even if they were, “habitual wrongful conduct on the part of one [official] will not establish the pattern or custom required for Monell liability.” See Bardzik v. Cnty. of Orange, No. SACV0700141, 2011 WL 13269699, at *11 (C.D. Cal. Oct. 26, 2011) (granting summary judgment on municipal liability claims premised on allegations of a supervisor’s repeated retaliatory acts); Sloman v. Tadlock, 21 F.3d 1462, 1470 (9th Cir. 1994) (“Individual action like the police chief’s habitual harassment of picketer does not rise to the level of the well-settled, widespread practices contemplated in the cases discussing municipal liability.” (citation modified)); see also Meehan v. Cnty. of Los Angeles, 856 F.2d 102, 107 (9th Cir. 1988) (finding that proof of two unconstitutional acts, “standing alone, does not support a finding of liability” under Monell); Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (“Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.”).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL 'O'**

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-00925-CAS-JDEx | Date | September 28, 2026 |
| Title | Michael A. DiMatteo v. Hurdle Clay Jacke, II et al | | |

amount to "deliberate indifference." Id. (citing Davis v. City of Ellensburg, 869 F.2d 1230, 1235 (9th Cir. 1989)).

Insofar as DiMatteo asserts a Monell claim premised on the County and LASD's failure to train or supervise, he raises no dispute of material fact. DiMatteo has not presented any evidence regarding training or supervision, let alone evidence that training or supervision was inadequate. See, e.g., White v. Cnty. of San Bernardino, No. 209CV00713, 2010 WL 11475595, at *8 (C.D. Cal. Apr. 6, 2010), aff'd, 503 F. App'x 551 (9th Cir. 2013) (granting summary judgment on a failure-to-train Monell claim where plaintiff provided "no evidence regarding [municipality]-wide training, nor even basic information about the specific training that [the direct tortfeasor] received").

Accordingly, DiMatteo's Monell claim fails.

## V. CONCLUSION

Accordingly, the Court **DENIES** defendants' motion for summary judgment on DiMatteo's First Amendment retaliation claim.

The Court **GRANTS** defendants' motion for summary judgment on DiMatteo's Monell municipal liability claim.

IT IS SO ORDERED.

00 : 00

Initials of Preparer CMJ